McHugh, J.
Pending before the Court in these consolidated actions are a series of summary judgment motions. The litigation itself consists of declaratoiyjudgment actions brought to determine the obligation of various insurance companies to defend The Charles GeorgeTruddng Company, Charles George, Sr., Dorothy George, James George, Charles George, Jr., The Charles George Reclamation Trust and Karen Karras (collectively “the Georges”)[1] in federal court litigation, now largely concluded, commenced by the federal government and the Commonwealth (collectively “the sovereigns”) to recover cleanup and other costs associated with a waste site the defendants were alleged to operate or control or with which they were associated. This litigation also involves, albeit less immediately, the insurers’ indemnity. The pending motions are decided in the following fashion for the following reasons:
A. THE OBLIGATION TO DEFEND
All parties[2] have moved for summary judgment on the question whether the insurers have an obligation to provide the Georges with a defense.
1. The Prior Opinion
On April 30, 1991,1 entered an Order (“the April 30 Order”), with an accompanying Memorandum, denying the Motion of Aetna Casualty & Surety Company (“Aetna”) for summary judgment declaring that Aetna had no duty to defend the Georges.[3] The April 30 Order was premised chiefly on two principles I viewed as controlling. The first was that Aetna had not demonstrated that no discharge for which the sovereigns sought recovery had been “sudden and accidental.” I put the matter in the following terms:
At this stage, and from this vantage, the relevant question thus becomes whether Aetna has demonstrated the absence of any genuine issue of material fact on the question whether any of the discharges for which the sovereigns seek recovery in the federal or state suits were both sudden and accidental. Paragraph 44 of the federal complaint says that “fo]ver the course of time, hazardous substances from the site have leaked toward and into the soil and under the ground water beneath the site.” Although the language of that paragraph carries with it the implication that the releases in question were not “sudden,” the federal government has not eschewed any recovery for “sudden and accidental" releases. Indeed, it has alleged in ¶59 of the complaint that the “releases” for which it seeks recovery under the statute include “any spilling, leaking ... emitting, emptying, discharging, . . . escaping ... or disposing into the environment.” (Emphasis added.) The term “release” as there used surely is broad enough to encompass sudden and accidental discharges.[4]
The state complaint alleges in !¶35 and 45 simply that there have been “releases” of hazardous materials as those terms are defined in the federal and state acts. Therefore, the state complaint, too, is framed in terms broad enough to countenance recovery for “sudden and accidental” releases as well as for releases of more gradual pedigree.
April 30 Order at 11-12 (emphasis added) (footnote omitted).
The second principle underlying the April 30 Order was that Aetna, in order to free itself from an obligation to defend, had the burden of demonstrating the absence of any genuine issue of material fact on the “sudden and accidental” question with binding effect on the sovereigns. I reached that conclusion for the following reason:
The importance of demonstrating “with conclusive effect on the third party” that no claim covered by the policy exists cannot be overstated. That requirement exists in order to avoid saddling the insured with the risks of inconsistent judgments. If one court concludes in a declaratory judgement action between the insured and the underwriter, for example, that, as a matter of fact, coverage does not exist but a third party later recovers from the insured by proving a set of facts the declaratory judgement court rejected, then the insured clearly would wind *178 up paying from its own pocket a judgment it had purchased the policy to guard against. Only a judgment on the duty to defend that is conclusive as to the third party will prevent that result. See Lumberman’s Mutual Casualty Co. v. Belleville Industries, Inc., 407 Mass. 675, 685-86 (1990).
April 30 Order at 6 (footnote omitted).
Aetna moved for reconsideration of the April 30 Order and the three other insurers, Continental Insurance Company, Fireman’s Fund Insurance Company and Employers Insurance of Wassau (“the insurers”), moved for summary judgment claiming the April 30 Order was wrong.
The April 30 Order has not aged well and subsequent decisions have, in my view, shown that it was wrong. First of all, on March 26, 1992, the Supreme Judicial Court issued its opinion in Liberty Mutual Insurance Company v. SCA Services, Inc., 412 Mass. 330 (1992). Faced there with an insurer’s motion for summary judgment in an action the insurer had brought to secure a declaration that it had no duty to defend SCA in a pollution claim brought against SCA in New York, the Court began its analysis in now-familiar fashion:
[Tjhe question of the initial duty of a liability insurer to defend third-party actions against the insured is decided by matching the third-party complaint with the policy provisions: if the allegations of the complaint are “reasonably susceptible” of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer must undertake the defense . . . Otherwise stated, the process is one of envisaging what kinds of losses may be proved as lying within the range of the allegations of the complaint, and then seeing whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy.
Id. at 331-32. Applying that principle to the case before it, the Court said that, under the terms of insurance policies indistinguishable from those involved here,
insurers would be obligated to defend SCA in the underlying lawsuit pending in the Federal District Court in New York if the complaint in that suit was reasonably susceptible of an interpretation that the release of pollutants was “sudden and accidental.”
Id. 334-35.
Continuing, the court held that the' complaint did not allege a “sudden” release of pollutants as the term “sudden” had been defined in Lumberman’s Mutual Casualty Co. v. Belleville Indus., 407 Mass. 675, 680-81 & n.4 (1990). As the Court put it,
[t]he complaint details routine business activity lasting over several months in which the toxic contents of the barrels brought by SCA to the landfill were either emptied into open trenches or dumped into trenches and flattened with a bulldozer. To an ordinary intelligent person reading the complaint in the New York action, it is evident that the government asserts contamination of the site, and the surrounding area and waters due to continuous waste disposal practices occurring over a protracted period of time as a concomitant part of a regular business activity. Such a situation is within the pollution exclusion because it is not “sudden and accidental.”
Id. at 336.
Then, in a passage that essentially gutted one of the central principles supporting the April 30 Order, the Court said as follows:
We also reject SCA’s contention that the insurers have not shown that they are entitled to a grant of summary judgment. Drawing on language from Sterilite Corp. v. Continental Casualty Co., 17 Mass.App.Ct. 316, 318-19 (1983), that the duty to defend is broader than the duty to indemnify, and that “the underlying complaint need only show... a possibility that the liability claim falls within the insurance coverage,” SCA argues that the insurers’ burden for summary judgment is an affirmative showing that there is no possibility that “(a]t least one claim against SCA may involve a ‘sudden and accidental’ discharge.”
The summary judgment record in this case is well-developed, and the allegations in the underlying complaint in the New York action go beyond mere conclusory statements of negligence to assert specific and detailed events and practices that led to the contamination. SCA has not pointed to anything which indicates that a reasonable reading of the complaint alleges a “sudden and accidental” discharge as we construed that term in the Lumbermen case. SCA’s opposition to the insurers’ motion for summary judgment amounts essentially to speculation that, within the routine operations of the landfill, any single discharge may have occurred suddenly and accidentally. Such a theory, even if accepted as true, “cannot contradict a reasonable reading of the allegations that the entire pattern of conduct was not a ‘sudden and accidental’ occurrence.” A.Johnson & Co. v. Aetna Casualty & Sun Co., 933 F.2d 66, 75 (1st Cir. 1991).[5]
Id. at 337-38 (emphasis added) (footnotes omitted).
Earlier, in Lumberman’s Mut. Casualty Co. v. Belleville Indus., 938 F.2d 1423, 1428 (1st Cir. 1991), cert. den., 112 S.Ct. 969 (1992), the United States Court of Appeals for the First Circuit had held that the “sudden and accidental” limitation on the pollution exclusion was inapplicable to a “pollution-prone operation” such as the operation of a hazardous waste handling facility. While the Supreme Judicial Court in SCA did not embrace the “pollution-prone” analysis the First Circuit had undertaken, it did cite the First Circuit’s decision with apparent approval in the following context
The only reasonable reading of the underlying complaint is, as we have stated, that the pollution of the landfill occurred gradually over several months of *179 repeated activity and not as the result of a “sudden and accidental” discharge.[6]
Liberty Mutual Insurance Company v. SCA Services, Inc., supra, 412 Mass. at 336-37. Note 6 reads as follows:
As mightbe expected, there exists a considerable body of case law rejecting insurance coverage where the insured has regularly carried on operations involving continual pollution. See, e.g., . . . Lumbermens Mut. Casualty Co. v. Belleville Indus., 938 F.2d 1423, 1430 (1st Cir. 1991), cert. den., 112 S.Ct. 969 (1992) . . .

Id.

There is, to be sure, a difference between the allegations of the sovereigns’ complaints in this case and the New York complaint filed in the SCA case. The New York complaint contained allegations that unequivocally described discharges occurring over a period of time. Paragraph 46, for example, stated that
[wjastes accepted by (the landfill operator] were disposed of at the site in trenches dug by him for that purpose. Barrels of waste were dumped into the open trenches and flattened with a bulldozer, or the contents of the barrels were emptied into the trenches and the barrels salvaged for reuse.
Id. at 333.
As stated earlier, the sovereigns’ complaints in this case are more general and less specific. The Georges urge that the greater generality of the allegations in this case commands a result different from the one the court reached in SCA. Whatever my own view on that question,[6] the point was decided adversely to the Georges in Landauer, Inc. v. Liberty Mutual Insurance Company, 36 Mass.App.Ct. 177 (1994). That case dealt with a third-party complaint some of the Georges, or their codefen-dants , brought against Landauer in the federal case here at issue. As the Appeals Court saw it, the material allegations of the third-party complaints “carried, over and replicated the substance of the [sovereigns’] complaints.” Id. at 179. Landauer sought a defense from Liberty Mutual, its general liability insurer. Liberty Mutual had issued a policy containing a pollution exclusion clause identical to the clause here at issue. Citing that clause, Liberty Mutual refused to defend and Landauer brought suit to obtain a declaration that Liberty was required to do so.
In concluding that Liberty Mutual had no obligation to defend, the Appeals Court analyzed the contents of the sovereigns’ complaints, le., the very complaints on the basis of which the Georges now argue that there is a duty to defend. Id. at 179-80. Having done so, the Court said:
Matching the allegations of the pleadings with the policy terms, especially “sudden and accidental,” was Liberty Mutual obliged to defend?
The SCA decision, laying pleadings similar to the pleadings herein by the side of similar policy provisions in a comparable environmental setting, declared — it was upon cross motions for summary judgment — that the answer to the question was No.
Id. at 181 (footnote omitted). Continuing, the Court rejected the “perhaps-there-is-a-covered-claim-lurking” contention the Georges make here:
The [Supreme Judicial C]ourt responded to a contention by SCA — like a contention Landauer has made in the present case — that “the insurers’ burden for summary judgment is an affirmative showing that there is no possibility that ‘[a]t least one claim against SCA may involve a “sudden and accidental” discharge.’ ”... The court said summary judgment could not be thus averted. SCA was tendering what “amounts essentially to speculation that, within the routine operations of the landfill, any single discharge may have occurred suddenly and accidentally. Such a theory, even if accepted as true, ‘cannot contradict a reasonable reading of the allegations that the entire pattern of conduct was not a “sudden and accidental” occurrence.’ ”...
Id. at 181-82.[7]
The Georges’ claim that the allegations of the sovereigns’ complaints triggers the insurers’ duty to defend thus has been rejected not only in principle but as that claim applies to the specific complaints this case involves. The April 30 Order was erroneous and the language of the sovereigns’ complaints gives rise to no duly to defend.
2. Other Contentions
Perhaps recognizing the difficulties they face in light of SCA, the Georges advance a series of contentions supporting what they claim is the insurers’ duly to defend in addition to their contention that the allegations of the complaints create that duty. I am unpersuaded that any of those contentions, or the record upon which they are based, creates a genuine issue of material fact on the coverage question.[8]
First is the Georges' contention that the 1983 fire and the 1983 leachate spill caused the “release” of significant quantities of contaminants and thus constitute “sudden and accidental” occurrences for which coverage exists. That contention, however, is similar to a contention made and rejected in Lumbermen Mut. Casualty Co. v. Belleville Indus., supra, 938 F.2d at 930, where Belleville alleged that a fire and a rainstorm caused at least some of the pollution for which the plaintiff in the underlying action sought recovery. In rejecting that contention, the Court analyzed the matter in the following fashion:
It is . . . the nature of an insured’s enterprise and its historical operations that determine the applicability of the policy provision. Belleville discharged pollutants as an ordinary part of its business operations; we simply cannot analyze these provisions as if it were a manufacturer of health foods that rarely, if ever, experienced a pollution-producing event.
*180 The essentially unrebutted affidavits of Paul Orben, Fireman’s Fund Appendix, Ex. 5D, Peter Fisher, id., Ex. 5F and Henri St. Pierre, id. Ex. 5, bring this case close to the operation described in BeüeviRe. The existence of permits that may have made the discharges lawful, see Opposition to Fireman’s Fund Motion for Summary Judgment at 4-20, does not change the fact that the discharges occurred. Just as in Belleville and SCA, the fact of the discharges and not their legality or illegality determines applicability of the “sudden and accidental” clause.
Moreover, the pollution exclusion clause at issue here and in virtually all of the other decided cases, excludes coverage for “property damage arising out of the . . . dispersal... [of] waste materials ... upon land”[9] unless that “dispersal” is “sudden and accidental.” There is absolutely no doubt on this record that the dispersal of waste materials on the site was not “sudden and accidental.”[10] On the contrary, dispersal of waste materials on the site was the Georges’ acknowledged business.
That being the case, neither the fire nor the leachate spill is a coverage-triggering event. The property damage for which sovereigns sought recovery in the underlying action unquestionably “arose out of’ dispersal of waste material at the site. Hussey Plastics Co., Inc. v. Continental Casualty Co., Civil Action No. 90-13104, Slip Opinion at 7-10 (D.Mass. June 17, 1993).
ÍO]nce there is ... an unbroken causal chain originating from a non-sudden and non-accidental polluting event . . . and extending to the ultimate property damage as to which insurance coverage is sought, and so long as that causal chain is substantial enough to satisfy the “arising out oF requirement of the pollution exclusion clause, the exclusion cannot be avoided merely by showing that a single link along the chain constituted a “sudden and accidental” polluting event.
Id. at 12. Both the fire and the leachate spill were polluting events that themselves arose out of the non-sudden and non-accidental dispersal of waste at the site. Neither event, even if viewed in isolation, thus provides a basis for coverage.
The Georges’ next contention is that the 1983 leach-ate spill provides the only basis for the Commonwealth’s recovery and thus that the “sudden and accidental” nature of that discharge must be determined independently.[11] I disagree. The thrust and essence of the Commonwealth’s claim is that an extended pattern of the Georges’ activity created a continuous polluting event or at the least a series of interconnected polluting events. The fact that the Commonwealth may have agreed not to seek recovery for some of the events or for some of the consequences of the events or both does not change the character of the events themselves. The fact that they arose out of a purposeful dispersal of waste at the site means that the events do not trigger coverage even if the Georges have been immunized from liability for many of them.
The Georges, citing Polaroid Corp. v. The Travelers Indemnity Corp., 414 Mass. 747, 762 (1993), next contend that the notices of responsibility the Environmental Protection Agency sent to them on May 11, 1983 gave rise to a duty to defend and that, as a result, that duty persisted until a judgment entered declaring that there was no such duty. It is true that the court in Hazen Paper Co. v. United States, 407 Mass. 689, 693-94 (1990), declared that the notice of responsibility the insured received from the EPA in that case was the equivalent of a “suit” and gave rise to a duty to defend. Here, the letter the Georges received, like the letter Polaroid received, stated that “releases” had occurred. See id. at 695. The letter does not, on its face, exclude coverage by showing that the releases in question were not “sudden and accidental.” Without more, then, the EPA letter would trigger a duty to defend that would remain until a declaration of no coverage binding on the sovereigns had entered. See Lumberman’s Mutual Casualty Co. v. Belleville Industries, Inc., 407 Mass. 675, 685-86 (1990); Sterilite Corporation v. Continental Casualty Co., 17 Mass.App.Ct. 316, 323 (1983). Unlike the situation on Polaroid, however, there was more here, specifically, the complaints the sovereigns filed in June of 1985. The language of those complaints interpreted in the light of recent cases, showed that the sovereigns were not seeking recovery for “sudden and accidental” releases and thus showed that there was no duty to defend.[12]
Finally, the Georges contend that the procedural order entered in the federal litigation “ ‘deemed’ that all defendants and third-party defendants would have all available claims against the others.” The action was then settled before the parties were obligated to specify what the “deemed” claims were. The Georges contend that the “deemer” was so broad that it might very well have included “sudden and accidental” releases and the consequences thereof. They thus claim that the “deemer” gave rise to the insurers’ duty to defend even if nothing else did.
I disagree. As stated earlier, the complaints on their face at least contemplate the possibility that some “sudden and accidental” releases occurred. That contemplation is not dispositive for the entire pattern the complaints reveal is, as a whole, not “sudden” and not “accidental.” Just as the possible existence of some “sudden and accidental” releases does not obligate the insurers to defend the complaints brought by the sovereigns, the possible existence of “deemed” claims for those releases does not obligate the insurers to defend the claims of other parties.
B. OTHER CONTENTIONS
What I have said moots or makes unnecessary a decision of the other claims the parties have advanced. The Georges’ claim for indemnity as a consequence of the insurers’ breach of their duty to defend fell as a matter of law with the Supreme Judicial Court’s decision in Polaroid Corp. v. The Travelers Indemnity Corp., *181 414 Mass. 747 (1993). That contention falls as a matter of fact with this decision.
Continental’s Motion for summary judgment on grounds of misrepresentation and the existence of a loss in progress at the time the policies were issued is moot because there is no duly to defend in any event. Wassau’s motion with regard to allocation of defense costs is moot because there is no defense obligation to allocate.
ORDER
In light of the foregoing, it is hereby ORDERED that summary judgment enter declaring that the insurers have no duty to defend or indemnify the Georges in connection with the sovereigns’ actions. The insurers will submit a form of judgment. .

 Karen Karras has filed no pleadings. See generally April 30, 1991 Order (Paper No. 69) at 16 n. 11.

 Aetna and the Georges previously moved for summary judgment. In an Order entered April 30, 1991, I denied that motion. Aetna filed a motion for reconsideration and thereafter settled its dispute with all claimants save Charles George, Sr., Dorothy George, The Charles George Trucking Company, and the Charles George Land Reclamation Trust. Pending before the court is a motion to enforce specifically what Aetna claims was a settlement it reached with those parties.

 I say “denying” because the portion of the April 30 Order of greatest concern to the insurers did deny Aetna’s motion. In addition, however, the April 30 Order allowed Aetna’s motion and declared that there was no duty to defend with respect to the claims asserted in Count IX of the federal suit or those asserted in Counts III, IV and V of the Commonwealth’s suit.

 In addition, and although not cited in the April 30 Order, ¶¶ 17-18 of the federal complaint allege as follows:
17. Between at least 1973 and 1976 hazardous substances were disposed of at the Site.
18. Over the course of time, hazardous substances from the Site have leaked toward and into the soil and the groundwater beneath the Site . . .

 In the Johnson case, the United States Court of Appeals for the First Circuit applied Maine law that embodies an approach to coverage determinations substantially similar to the approach required by Massachusetts law.

 After reading the complaints as a whole together with the decisions in SCA, Johnson and the federal Belleville case, I am not persuaded by the Georges’ position.

 Two decisions of this Court, also dealing with the same complaints and the same site, have reached the same conclusion. Roche Brothers Barrel & Drum Co. v. American Employers Ins. Co., 2 Mass. L. Rptr. No. 6, 114 (June 13, 1994); and Polaroid Corp. v. Traveler’s Indemnity Co., Middlesex No. 88-5208 (September 22, 1992).

 The necessary predicate for most of those contentions is an assertion that even in the absence of a duty to defend arising from the allegations of the complaint, the record actually compiled in the case may give rise to such a duty. See April 30 Order at 7 n.4. For present purposes, I shall assume that that assertion is correct.

 The reference is to the pollution exclusion clause of the policies which provides, inter alia, that the “insurance does not apply ... to bodily injury or property damage arising out of the discharge, dispersal, release or escape of . . . toxic chemicals . . . [unless] the discharge, dispersal, release or escape is sudden and accidental.”

 Regardless of when a “release” occurs, a “dispersal” is not limited to material’s escape from the site. The word “disperse” has several meanings. The meaning most applicable here is “to cause to become spread widely.” Websters’ Ninth New Collegiate Dictionary 365 (Merriam ed. 1987). Interpretation of unambiguous contractual terms like these presents a question of law for the court, Daley v. J.F. White Contracting Co., 347 Mass. 285, 288 (1964); Kelleher v. American Mutual Ins. Co., 32 Mass.App.Ct. 501, 502 (1992), and, in answering that question, the Court should give weight to the plain and ordinary meaning of the language the parties used. Kelleher, supra, at 504. When that is done, the clause reaches dispersal of waste at the site and not simply the material’s escape to adjoining lands.

 There is substantial doubt, however, whether the present record will support a conclusion that that discharge, even if viewed in isolation, was sudden and accidental. See Fireman’s Fund Supplemental Memorandum of Law in Support of Motion for Summary Judgment at 12-14.

 The Georges have not advanced a claim that they were entitled to a defense for the period May 11, 1983 until the time the complaints were filed in June of 1985.